Filed 5/28/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>STEVEN PETRILLI,<br><br>        Defendant and Appellant. | A131141<br><br>(San Francisco City & County<br>Super. Ct. No. 204890-01/02362614) |

Late one night, defendant Steven Petrilli drove a stolen minivan around San Francisco with his wife and two acquaintances. The acquaintances periodically left the van, committed a robbery, and returned to the van. Once they were back inside, defendant drove away. After the fourth such robbery, police spotted the van, and defendant drove off at a high speed. The subsequent pursuit ended when defendant rammed the van into a police car, killing a police officer in the car. Defendant was convicted of felony murder with special circumstances, as well as four counts of robbery and other crimes.

Defendant contends, and the Attorney General concedes, that the felony murder conviction must be reversed because of instructional error. We agree.

Defendant also contends the trial court erred in admitting the testimony of his wife. She had earlier testified under subpoena before a grand jury investigating the incident, and when she sought to invoke the spousal testimonial privilege to avoid testifying at trial, the trial court ruled she had waived the privilege by appearing before

_____

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A. and II.C.

the grand jury. Applying the plain language of Evidence Code[1] section 973, which governs waiver of the spousal testimonial privilege, we conclude a spouse's testimony before a grand jury does not waive his or her subsequent assertion of the spousal testimonial privilege at a criminal trial. We further conclude the admission of defendant's wife's testimony was prejudicial in connection with three of defendant's four robbery convictions. We accordingly reverse defendant's convictions for special circumstances murder, conspiracy to commit robbery, and three counts of robbery, but we affirm the remainder of defendant's convictions.

## I. BACKGROUND

Defendant and two others were charged in an indictment, filed April 4, 2008, with special circumstances murder, committed in the course of a robbery. (Pen. Code, §§ 187, 190.2, subd. (a)(17)(A); count I.) The three were also charged with implied malice second degree murder alleged to be a serious felony (Pen. Code, §§ 187, 1192.7, subd. (c)(1); count II); conspiracy to commit robbery (Pen. Code, § 182, subd. (a)(1); count III); four counts of robbery, all alleged to be serious and violent felonies (Pen. Code, §§ 211, 667.5, subd. (c); 1192.7, subd. (c); counts IV, V, VI, VII); evading a police officer and causing serious bodily injury (Veh. Code, § 2800.3, subd. (a); count VIII); and vehicular manslaughter (Pen. Code, § 192, subd. (c)(1); count IX). Defendant alone was charged with driving a stolen vehicle. (Veh. Code, § 10851, subd. (a); count X.)

Defendant was tried separately from his two codefendants. Witnesses testified to four separate robberies in San Francisco on the night of July 26, and the early morning of July 27, 2006. Although the details varied, each robbery was committed by two African-American men. Following each robbery, the men entered a minivan, and the van drove away. The victim of the first robbery said a third person was driving the van, but he was unable to provide any identifying information about the driver. The two victims of the second robbery were unable to see the driver of the van at all. A witness to the third robbery saw a man driving the van, but she, too, was unable to provide any further

---

[1] All statutory references are to the Evidence Code unless otherwise indicated.

2

information about him. Two of these witnesses saw a woman in the passenger seat of the van.

The victim of the fourth robbery was able to confront the driver of the van, whom the victim identified as defendant. When defendant threatened him, the victim attempted to kick defendant's face through the open window, but defendant drove the van away. This victim called 911, and two officers arrived in a patrol car within five minutes. After some questions, the police asked the victim to ride with them in an attempt to locate the van, and the three drove off. The victim eventually spotted a van similar to the one involved in his robbery in the drive-through lane of a McDonald's restaurant. When the officers checked the license plate of the van, they learned it had been reported as stolen. After the patrol car made a U-turn and activated its lights, the van left the drive-through lane, drove over a curb, and took off at high speed. The patrol car followed. The victim saw defendant in the driver's seat.

A reckless, high-speed chase ensued, on and off the highway, involving several police cars. Eventually, the van left the highway and, at high speed, ran into a patrol car stopped in an intersection, flipping the patrol car. The van then weaved into parked cars and came to a stop. Defendant, the two codefendants, and defendant's wife, Jessica Chamberlain, emerged from the wrecked van. A police officer who was in the driver's seat of the rammed patrol car eventually died as the result of injuries suffered in the collision.

Chamberlain testified at trial under a grant of immunity. She explained she and defendant took the van to a Burger King restaurant that night to pick up one of the codefendants, who was a mutual friend.[2] With him was the second codefendant, whom she had not met before. The four rode around for awhile, defendant driving. They ended up in the parking lot of a Safeway grocery store, where the two codefendants got out of the van and committed a robbery. When the two returned to the van, defendant drove off.

---

[2] The owner of the van testified it had been stolen a few weeks earlier. There was no testimony explaining how defendant came to be in possession of the van.

3

Chamberlain then recounted three other robberies and the chase, generally confirming the testimony of the other witnesses. Chamberlain said defendant was the driver of the van throughout.

Following the last robbery, Chamberlain testified, they drove the van to a McDonald's restaurant on Third Street, but the restaurant was closed. Defendant then drove to a McDonald's restaurant on Bayshore, where they entered the drive-through lane and ordered food. While they were waiting to pick up their food, Chamberlain saw the police car and alerted defendant. The four at first decided to remain calm and ignore the police vehicle, but just before they were to pay, the occupants of the van panicked. Defendant drove over the curb and took off.

A videotape of the four talking together in a room at the jail following the crash was played for the jury. The codefendants made vague references to at least three of the robberies. One of the codefendants told defendant, "[Y]ou don't have no robbery on you. All you, all you have is evading the police." Defendant told them he tried to get the van to go faster, but he could not get it past 85 miles per hour. All regretted stopping at McDonald's, a decision they blamed on Chamberlain.

Defendant was found guilty of all charges, and the enhancement allegations were found true. He was sentenced to a term of life without the possibility of parole on the special circumstances murder charge, as well as a combined consecutive determinate term of 7 years 8 months on the charges of evading a police officer and driving a stolen vehicle. Sentences on the remaining counts were imposed and stayed.

## II. DISCUSSION

Defendant raises three claims of error, one of which the Attorney General concedes to be meritorious.

### A. *Error in Instructing on the "Escape Rule"*

The "escape rule" provides that certain crimes terminate when the defendant " 'has actually reached a temporary place of safety.' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 341 (*Wilkins*).) The trial court instructed on the escape rule, but it expressly limited application of the rule to the robbery charges, implicitly excluding the felony murder

4

charge.  This was consistent with a use instruction in the CALCRIM standard jury instructions, which cited as authority *People v. Cavitt* (2004) 33 Cal.4th 187, 208. (2 Judicial Council of Cal., Jury Instns. (2012) Bench Notes to CALCRIM No. 3261, p. 990.)  In closing, the prosecutor relied on this limitation, arguing to the jury, "If you decide there is a place of temporary safety, it does not absolve [defendant] of liability for one continuous transaction of felony murder," and contended the felony murder doctrine reached any death that occurred "because of [the underlying] crime."

In *Wilkins*, decided several years after trial, the Supreme Court disapproved the CALCRIM use instruction and held the escape rule applicable to a defendant's liability under the felony murder rule.  In so doing, the court affirmed that " '[f]elony-murder liability continues throughout the flight of a perpetrator from the scene of a robbery until the perpetrator reaches a place of temporary safety.' " (*Wilkins, supra*, 56 Cal.App.4th at pp. 342–343, 345.)  The court accordingly reversed the felony murder conviction of a defendant who had caused a fatal traffic accident while transporting appliances burglarized from a home several hours earlier, in which no escape rule instruction had been given.  (*Id.* at pp. 338–339, 352.)

Defendant argues, and the Attorney General concedes, his conviction for first degree murder must be reversed because the jury reasonably could have concluded that he and his codefendants had reached a place of temporary safety when they drove into the McDonald's drive-through lane.  We agree the error was prejudicial on these facts and reverse the conviction.  (*Chapman v. California* (1967) 386 U.S. 18, 24; see *Wilkins, supra*, 56 Cal.4th at p. 350.)

## B.  *Waiver of the Spousal Testimonial Privilege*

Defendant contends the trial court erred in holding Chamberlain waived her right to invoke the spousal testimonial privilege by providing testimony to the grand jury.

### 1.  *Procedural Background*

Chamberlain's testimony was admitted over a defense objection under the spousal testimonial privilege, asserted on Chamberlain's behalf.  Chamberlain had testified before the grand jury under subpoena, giving testimony materially the same as her eventual

testimony at trial. During a hearing on defendant's objection held prior to trial, Chamberlain explained she appeared before the grand jury "So I could stay out of jail" and believed she would go to jail if she did not testify. At the time, she claimed, she did not know that the proceeding "had something to do with [defendant]." Had she known she was testifying against her husband, she said, she would not have appeared.

Chamberlain was represented by appointed counsel in connection with her grand jury testimony. In declarations submitted to the court, the attorney said he did not recall discussing the issue of spousal privilege with Chamberlain, since "the focus of my representation of Ms. Chamberlain quickly became her potential exposure to prosecution and ensuring that I protected her Fifth Amendment rights." The attorney discussed an immunity agreement for Chamberlain with the deputy district attorney, but the deputy "said that he was not going to give [Chamberlain] immunity for her testimony because he did not think she had exposure. However, he promised me that she would not be prosecuted in connection with these events unless she perjured herself before the Grand Jury." On that assurance, the attorney permitted Chamberlain to testify.

The trial court entered a written decision allowing the testimony, basing its decision on *People v. Resendez* (1993) 12 Cal.App.4th 98 (*Resendez*), which held that a spouse's testimony at a preliminary hearing waived the assertion of the spousal testimonial privilege at trial. With respect to Chamberlain's testimony regarding the circumstances of her appearance in front of the grand jury, the court held her grand jury testimony was not "erroneously compelled" for purposes of section 973 because Chamberlain believed providing testimony would preclude criminal charges against her.

### 2. *Legal Background*

Resolution of defendant's claim of error requires a review both of the spousal testimonial privilege and the nature of grand jury proceedings.

### a. The Spousal Testimonial Privilege

Evidentiary privileges in California are a creature of statute. (*People v. Sinohui* (2002) 28 Cal.4th 205, 211 (*Sinohui*).) It is generally held that "evidentiary privileges should be narrowly construed because they prevent otherwise admissible and relevant

6

evidence from coming to light." (*Union Bank of California v. Superior Court* (2005) 130 Cal.App.4th 378, 392.) "[T]he courts of this state have no power to expand [the statutory privileges] to recognize implied exceptions." (*Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 206.)

As relevant here, the spousal testimonial privilege is governed by three statutes. Section 970 states that a married person has a privilege "not to testify against" his or her spouse "in any proceeding."[3] Similarly, section 971 provides a privilege against being called as a witness in any proceeding to which one's spouse is a party. Waiver of the spousal testimonial privilege is governed by its own statute, section 973, rather than the more general statute governing waiver of privileges, section 912. Under subdivision (a) of section 973, "[u]nless erroneously compelled to do so, a married person who testifies in a proceeding to which his spouse is a party, or who testifies against his spouse in any proceeding, does not have a privilege under this article in the proceeding in which such testimony is given."[4] Unlike the confidential marital communication privilege of section 980, the testimonial privilege is personal to the testifying spouse (*People v. McWhorter* (2009) 47 Cal.4th 318, 374 (*McWhorter*)), but the other spouse has standing to raise as error a trial court's refusal to recognize an assertion of the privilege (§ 918). The medieval origin of the spousal testimonial privilege was premised on the " 'long-abandoned doctrine[]' " that a wife had no separate legal existence from her husband, but the privilege persists on the belief it " ' "preserve[s] marital harmony," ' ' "protect[s] marital privacy," ' and ' "promote[s] the socially beneficial institution of marriage." ' " (*Sinohui, supra*, 28 Cal.4th at pp. 210–211.)

---

[3] "Proceeding" is defined broadly to mean virtually any type of hearing at which "testimony can be compelled by law [to be] given," including grand jury proceedings. (§ 901 & Cal. Law Revision Com. com., 29B pt. 3A West's Ann. Evid. Code (2014 Supp.) foll. § 901, p. 24.)

[4] The remainder of section 973 is not relevant here.

### b. The Grand Jury

The grand jury is a statutory body empowered to investigate "public offenses committed or triable" within the county in which it sits. (Pen. Code, § 917.) Because the grand jury is an investigative body, "the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning," at least in theory. (*Blair v. United States* (1919) 250 U.S. 273, 282; but see *Hawkins v. Superior Court* (1978) 22 Cal.3d 584, 591 [noting the "distinct and largely inconsistent functions" of the grand jury as accuser and impartial fact finder].)[5] Should the grand jury find probable cause to believe a crime has been committed, it prepares a charging document, known as an indictment, which is presented to an appropriate court. (Pen. Code, §§ 889, 917.) With limited exceptions, the filing of an indictment is one of two ways to commence a felony prosecution. The second is the filing of an information, the name given to a charging document prepared by the district attorney. (Pen. Code, §§ 682, 737, 739, 804; *People v. Tideman* (1962) 57 Cal.2d 574, 579.)

Given the limitation of its role to investigation and accusation, the proceedings of the grand jury are distinguished from any subsequent criminal prosecution. "It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." (*United States v. Williams* (1992) 504 U.S. 36, 51.) "[T]he grand jury serves as part of *the charging process* of criminal procedure, not *the adjudicative process* that is the province of the courts or trial jury." (*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1026.) "[W]hen engaged in its indicting for crime function, [the grand jury] is in no proper sense a criminal proceeding." (*M.C.A. v. State of California* (1982) 128 Cal.App.3d 225, 237.)

---

[5] Because of doubts about the fairness of the grand jury proceeding, which is typically dominated by the district attorney's office, *Hawkins* held that a defendant accused by the grand jury had a right to the equivalent of a preliminary hearing. (*Hawkins v. Superior Court, supra,* 22 Cal.3d at pp. 589, 594.) This result was later overturned by the electorate in Proposition 115, now article I, section 14.1 of the California Constitution. (*Bowen v. Superior Court* (1991) 1 Cal.4th 36, 39.)

Accordingly, the procedural rights afforded a defendant in a criminal prosecution are not recognized in connection with grand jury proceedings. A person who is the target of a grand jury inquiry, even if identifiable, has no right to be present or to be represented by counsel at grand jury proceedings, to refuse to appear as a witness before the grand jury, or to produce witnesses on his or her own behalf. (*People v. Brown* (1999) 75 Cal.App.4th 916, 932 (*Brown*); *People v. Dupree* (1957) 156 Cal.App.2d 60, 65; *In re Lemon* (1936) 15 Cal.App.2d 82, 91–92 (*Lemon*).)

### 3. *Discussion*

With that background, we address defendant's claim of error in the admission of Chamberlain's testimony.

Given the statutory nature of evidentiary privileges, our task is necessarily one of statutory interpretation. In interpreting a statute, " 'it is well settled that we must look first to the words of the statute, "because they generally provide the most reliable indicator of legislative intent." [Citation.] If the statutory language is clear and unambiguous our inquiry ends. "If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." [Citations.] In reading statutes, we are mindful that words are to be given their plain and commonsense meaning. [Citation.]' [Citation.] Thus, we 'avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend. [Citations.]' " (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1394.) We interpret a statute de novo. (*In re Marriage of Cantarella* (2011) 191 Cal.App.4th 916, 921.)

Section 973, subdivision (a) provides two ways in which the spousal testimonial privilege may be waived. The nonparty spouse may "testif[y] in a proceeding to which his spouse is a party" or may "testif[y] against his spouse in any proceeding." Importantly, however, the waiver applies only "in the proceeding in which such testimony is given." (*Ibid.*) As a result, under the unambiguous language of the statute, Chamberlain waived her right to assert the privilege at trial only if (1) defendant was a party to the grand jury proceeding and/or (2) the grand jury proceeding was the same

9

"proceeding" as his criminal prosecution.  The latter requirement necessarily follows from the restriction of the waiver to the proceeding "in which such testimony is given"; if the grand jury proceeding was a different proceeding from the criminal prosecution, any waiver from testimony at the grand jury proceeding would not carry over to the criminal trial.  We conclude neither of these requirements was met here.

As discussed above, a grand jury proceeding is investigatory, not adversarial.  As a result, an indicted person is not deemed to have been a party to the grand jury proceeding that indicted him or her.  (*People v. Johnson* (1968) 68 Cal.2d 646, 654 ["defendant was simply not a 'party' to the earlier (grand jury) proceeding"], overruled on other grounds as stated in *People v. Chavez* (1980) 26 Cal.3d 334, 353–356.)  "[N]o person has the status of a party defendant in [a grand jury] investigation which is held merely for the purpose of determining whether any criminal proceeding shall be commenced." (*Lemon, supra,* 15 Cal.App.2d at p. 85; see also *In re McDonough* (1937) 21 Cal.App.2d 287, 288 (*McDonough*) [at a grand jury investigation, a putative defendant "has but the status of a witness"].)  Because defendant was not a party to the grand jury proceeding at which Chamberlain testified, her testimony there did not constitute a waiver of the spousal testimonial privilege under the first part of section 973, subdivision (a).

Further, while there is no question a grand jury proceeding is a "proceeding" for purposes of the Evidence Code, it is not the *same* proceeding as a subsequent criminal prosecution.  The grand jury proceeding is not part of " '*the adjudicative process* that is the province of the courts or trial jury.' " (*Brown, supra,* 75 Cal.App.4th at p. 932.)  "[A] grand jury investigation is in no proper sense a criminal proceeding," and " 'the examination of witnesses before [the grand jury] . . . [is] "no part of criminal proceedings against the accused, but are merely to assist the grand jury in determining whether such proceedings shall be commenced." ' " (*Lemon, supra*, 15 Cal.App.2d at pp. 85, 87; see similarly *McDonough, supra*, 21 Cal.App.2d at p. 288.)  As noted above, a criminal prosecution is not even deemed to exist prior to the filing of an indictment or information.  Such commencement of a prosecution "is far from a mere formalism.  It is the starting point of our whole system of adversary criminal justice.  For it is only then that the

10

government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified." (*Kirby v. Illinois* (1972) 406 U.S. 682, 689.) Accordingly, there was no waiver under the second part of section 973, subdivision (a), because any waiver resulting from Chamberlain's grand jury testimony did not carry over to the criminal prosecution, which was a different "proceeding" from the grand jury proceedings.[6]

While the Attorney General concedes defendant was not a party to the grand jury proceedings, she argues, in a conclusory manner and without citation to authority, that the trial court should be affirmed because "the proceedings from investigation to charging document to jury trial are part of a continuous proceeding." For the reasons stated, the argument is inconsistent with virtually all judicial authority governing the respective nature of grand jury and criminal proceedings.

*Resendez*, on which the trial court relied, is entirely consistent with our decision. *Resendez*'s holding that a spouse's testimony at a preliminary hearing waives assertion of the spousal testimonial privilege at trial is undoubtedly correct, since a defendant's preliminary hearing occurs in the context of the same criminal proceeding as his or her trial, to which the defendant is unquestionably a party, thereby satisfying both prongs of section 973, subdivision (a). (*Resendez, supra*, 12 Cal.App.4th at p. 107; see similarly *People v. Lankford* (1976) 55 Cal.App.3d 203, 210, disapproved on other grounds in

---

[6] We have neither found nor been pointed to any pertinent authority from California or other jurisdictions on this issue. The nature of the spousal testimonial privilege varies from jurisdiction to jurisdiction, making rulings from other courts of limited value. (See *In re A Grand Jury Subpoena* (2006) 447 Mass. 88, 98, fn. 8 [849 N.E.2d 797, 805, fn. 8] [discussing differences among jurisdictions].) As a particular example, while the court in *Croom v. United States* (D.C.Ct.App. 1988) 546 A.2d 1006, ruled that an appearance before the grand jury *does* result in waiver of the spousal testimonial privilege at trial, the decision has no direct application here because the court applied common law waiver principles, rather than the waiver statute with which we are here concerned. (*Id.* at pp. 1008–1009.) Given the statutory nature of California privileges (*Wells Fargo Bank v. Superior Court, supra*, 22 Cal.4th 201, 206), we are bound by the specific language of section 973, subdivision (a), which leads to a result opposite to that in *Croom*.

*People v. Collins* (1976) 17 Cal.3d 687, 694, fn. 4.) Given the differences between a preliminary hearing and a grand jury proceeding, however, a different conclusion is mandated regarding grand jury testimony, for the reasons discussed above.[7]

Although our inquiry ends with the unambiguous language of section 973, we note there are sound reasons in policy not to deem a waiver of the spousal testimonial privilege on the basis of grand jury testimony. As discussed above, the proceedings of the grand jury are investigative, not adversarial, and "[i]t need not identify the offender it suspects, or even 'the precise nature of the offense' it is investigating." (*United States v. Williams, supra,* 504 U.S. at p. 48.) While there could have been little mystery about the purpose of the grand jury in seeking Chamberlain's testimony, that is not necessarily the case in every instance. A witness before the grand jury might not recognize the impact of his or her testimony on the penal interests of a spouse. In addition, the deputy district attorney conducting a grand jury investigation is under no duty to inform witnesses of the existence and potential availability of the spousal testimonial privilege. (See, e.g., *McWhorter, supra*, 47 Cal.4th at p. 374 [court has no duty to inform witness of testimonial privilege].) At an adversarial hearing, it may be expected counsel for the party spouse will ensure the witness spouse is aware of his or her privilege against giving adverse testimony, either directly or by a request for instructions to the court. (See *McWhorter*, at p. 375; *Resendez, supra,* 12 Cal.App.4th at p. 109, fn. 6.) There are no similar institutional circumstances to give assurance a witness before the grand jury will become aware of the privilege. Because the soul of waiver is the *knowing* relinquishment of a right (*People v. McKinnon* (2011) 52 Cal.4th 610, 636, fn. 16), the grand jury

---

[7] The primary focus of the *Resendez* decision was whether the spouse's testimony had been " 'erroneously compelled' " under section 973, subdivision (a) because she believed she was required to testify at the preliminary hearing and was not informed of the spousal testimonial privilege. (*Resendez, supra*, 12 Cal.App.4th at pp. 108–109.) This discussion is irrelevant here, since our reading of the statutory language compels the conclusion testimony before a grand jury does not give rise to a waiver of the privilege at the time of trial, regardless of whether the grand jury testimony was erroneously compelled.

structure provides no basis for presuming testimony by a spouse constituted a genuine waiver of the spousal testimonial privilege.

### 4. *Prejudice*

Given the trial court's error in refusing to recognize Chamberlain's assertion of the spousal testimonial privilege, defendant is entitled to the reversal of any conviction as to which her testimony was prejudicial. We evaluate harmless error in the admission of evidence under the standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (See *People v. Fuaiva* (2012) 53 Cal.4th 622, 671.) Reversal is required if "the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.)

We conclude the admission of Chamberlain's testimony was prejudicial in connection with defendant's convictions on the counts associated with the first three robberies, counts V, VI, and VII. The witnesses to these robberies were not able to identify, or even to describe, the driver of the van. The various conversations recorded by the prosecution from jail and played for the jury, while suggestive, did not definitively credit defendant with driving the van at the time of any particular robbery. Only Chamberlain's testimony unambiguously placed defendant in the van at the time of these robberies and explained his presence. While we recognize the jury could have inferred from defendant's presence in the van later in the evening that he was also driving earlier, it is reasonably probable the jury would have acquitted defendant of these charges had Chamberlain not testified, given the reasonable doubt standard. The same is true of defendant's conviction for conspiracy to commit robbery; without Chamberlain's testimony, there is no compelling basis for finding an agreement with the codefendants beyond a reasonable doubt. These convictions must be reversed.

With respect to the crimes beginning with the last robbery, however, Chamberlain's testimony was less critical. The victim of the final robbery got a good look at defendant during the robbery, even attempting to kick him through the open vehicle window, and identified defendant at trial. The victim again saw defendant in the

13

driver's seat while the van was in line at McDonald's, and he and two of the testifying police officers watched the van from the time it left that line until it struck the police vehicle, at which time defendant emerged with the others from the wrecked van. Throughout that period, there was no time at which it was reasonably possible that a different person took the wheel. The conclusion defendant was driving during this time was further supported by the comments of the codefendants in the jail and defendant's own references to his inability to push the van to go faster during the chase. The evidence was therefore very strong that defendant participated in the last robbery and drove the van during the police chase. For the final robbery (charged in count IV) and the counts associated with the police chase, evading a police officer and causing serious bodily injury, vehicular manslaughter, and driving a stolen vehicle (counts VIII, IX, and X), we find no probability of a more favorable result in the absence of Chamberlain's testimony. The same is true of defendant's conviction for second degree murder (count II), which was based entirely on the reckless manner in which he drove in causing the collision. The trial court's error in admitting Chamberlain's testimony provides no basis for reversing these convictions.

## C. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct by (1) misstating the law of felony murder, (2) appealing to passion and prejudice in arguing for conviction on the felony murder charge, and (3) making various other improper arguments, as detailed below. Because they relate only to the reversed felony murder conviction, the first two arguments are mooted by our reversal of that conviction.

The other improper arguments were harmless. Defendant contends (1) the prosecutor committed *Griffin*[8] error by arguing that if defendant were innocent he would have told his mother during a conversation between the two played for the jury during rebuttal; (2) the prosecutor misled the jury in arguing defendant would have told his mother during the same conversation if he had been coerced by his codefendants; (3) the

---

[8] *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*).

14

misled the jury by characterizing defendant as the "lead witness" for the prosecution, based on his recorded statements in jail; and (4) the prosecutor referred to evidence outside the record in telling the jury the deceased police officer had been "paralleling the pursuit." *Griffin* error occurs when a prosecutor comments " 'upon a defendant's failure to testify in his or her own behalf' " (*People v. Thomas* (2012) 54 Cal.4th 908, 945), and it is a serious matter. Because the prosecutor's comment related entirely to defendant's conduct during an out-of-court conversation, with no allusion to his failure to testify at trial, it did not constitute *Griffin* error. (See *People v. Tully* (2012) 54 Cal.4th 952, 1021.) We decline to decide whether any of the remaining arguments constituted misconduct because they were peripheral to the primary evidence against defendant on the affirmed convictions. On those counts, the evidence was strong, and the prosecutor's purported misconduct was harmless under the standards either of *Watson, supra*, 46 Cal.2d 818 or *Chapman v. California*, *supra*, 386 U.S. 18.

## III. DISPOSITION

Defendant's convictions on counts I (first degree murder), III (conspiracy to commit robbery), V, VI, and VII (all robbery) are reversed, as are the findings on the enhancement allegations associated with these counts. Defendant's convictions on the remaining counts are affirmed. The matter is remanded to the trial court for further proceedings consistent with this decision.

_____
Margulies, Acting P.J.

We concur:

_____
Banke, J.


_____
Becton, J.[*]
_____
[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15

Trial Court:   San Francisco City and County Superior Court

Trial Judge:   Hon. Newton J. Lam

Counsel:

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Assistant Attorneys General, Catherine A. Rivlin and Allen R. Crown, Deputy Attorneys General for Plaintiff and Respondent.